I'm not sure how you want to do this. I guess you folks have to figure out how you want to present the argument. But do others, the defendants don't disagree. I think our form of notice of oral argument had plaintiffs counseled from Montone that you can name Lisa Manchel going first and then Ms. Romano on behalf of the Astra plaintiffs. OK. May I please the court? Unless I'm, I'm sorry, go ahead. Put your name on the record, then I'll ask. Lisa Manchel on behalf of Valerie Montone, plaintiff below and appellant in this court. Thanks, Ms. Manchel. Unless I'm missing something, the only real distinction in the two cases is the issue of derivative standing. Is there any other issue that's unique to one case that doesn't pop up in the other one? I would ask that that question be directed at Ms. Romano. I wasn't in privity with her clients and I didn't even read their summary judgment brief. So I don't want to misstep. All right. I don't know. OK, fine. I really don't know the answer. Perhaps on political retaliatory motive, which is the turning point on that claim, on which Plaintiff Montone seeks reversal, there's an identity of issues, although probably not of proofs because their discovery was separate. We didn't do identical discovery. We sought to be joined for discovery purposes. That motion was denied and we lived our separate lives. OK, so I don't know their fact record. And I would ask to reserve two minutes for rebuttal. Sure. The court below dismissed the political retaliation claim based on a misreading of the evidence that's cognizable on Plaintiff's prima facie causation element. The burdens of Prover said forth in Mount Healthy by the U.S. Supreme Court, which has been followed by this circuit in Cali for political retaliation claims. And there's simply no requirement of direct evidence on prima facie political motive. Mount Healthy does not state any such direct evidence requirement. And Cali, Goodman, Stevens, a trio of on point cases of this court have not imposed any such requirement. Circumstantial evidence is sufficient to carry Plaintiff's prima facie motive burden. In the analogous Price Waterhouse model for proving discriminatory intent in mixed motive cases where the burdens are analogous to those under Mount Healthy, the U.S. Supreme Court has held on point in Desert Palace versus Costa that there is no direct evidence requirement on the plaintiff's prima facie discriminatory motive. OK, so we say we're with you on that, that there has to be circumstantial evidence. All right. Or it's enough to have circumstantial evidence. Talk to us about the about the the motivating factor point, which the facts of the law, Your Honor, the facts that carry the day and require reversal in Plaintiff's opinion. Yeah. Talk to us about what is. Well, let me put it this way. Your opponents say, look, we've got plenty of record evidence here that there was a departmental restructuring, that there was a cost cutting move afoot. And that's and there was a a thoughtful decision made about how to redeploy resources using less expensive, highly remunerated sergeants to do jobs that had been formerly done by highly paid lieutenants. And if if nobody gets promoted because of that. You can't really say fairly that, oh, my gosh, it's all because they they're they hate me because I suppose it supported the mayor's opponent. That just doesn't wash. Assume that they had at least some of the motives they described. Is it good enough for them to have those legitimate motives for their behavior? No, Your Honor, and I'll refute factually that the premise you've laid out in a moment, if the panel will indulge me. But no, it wouldn't be sufficient as a matter of law. The burden shifting model under Galley and Mount Healthy is that if that's what defendants believe, that they had mixed motives and one, well, they say they had one motive. It was legitimate. The plaintiff has sufficient proof of the illegitimate motive being political animus or wanting to give patronage to political allies and not promote her into a position held aside for those people. Defendants could prove the affirmative defense that nevertheless, they would, even if there is evidence of a substantial motivating factor being her political affiliation, they can avail themselves of the affirmative defense under Galley and prove that, well, we would have done the same thing anyway, because, look, we save money. Look, we thought about how to reorganize the department. And even if she hadn't been someone we wanted to retaliate against for her political conduct, we would have done the same thing anyway. The burdens of proof permit defendants to make those arguments as an affirmative defense on which they bear the burden of persuasion. The record in this case is not so one-sided that they're entitled to prevail not only on plaintiff's prima facie proofs of substantial and motivating factor, but also on this affirmative defense they posit. And I'm going to start a little backwards and address the proofs you mentioned. Let's start with the cost. Am I incorrect? Did it cost them more to do it the way they wanted to do it than? It's their affirmative defense. There's no evidence in the record that the reorganization saved money. I've said it forth in the brief. It was genuinely disputed in the summary judgment papers before the district court. Brian O'Reilly testified. Their sole evidence for saving money, essentially, is a snippet of deposition testimony where I asked Brian O'Reilly, you say that the overtime went down in 04, 05, and 06, I believe those are the years. And he says, yes, down from appropriations. And then I go on to ask him in testimony defendants conveniently omit from their appellate papers, was there any study of the cost benefits alleged in the reorganization? And Brian O'Reilly testified, no. He's the business administrator of Jersey City. There was no cost benefit analysis ever done. And he also testified that the reorganization was so short-lived that no reliable measure could have been obtained had they tried, which they did not, to demonstrate there were any costs. But that might demonstrate that Chief Troy wasn't a very careful thinker about the money, although he was trying to be, but it doesn't mean that he was ill-motivated, right? I mean, you can be wrong about something without being ill-motivated. Well, it may mean that while, as other proofs show that I'd like to recite for the court, Troy and Healy wanted to punish Valerie Montoya for political activity, they also thought, yeah, and we'll save some money, too. That'll be great. Deputy Chief Russ testified, didn't he, that he understood this was a cost-cutting move. No, with all due respect, Deputy Chief Russ testified that Troy made statements to him that he thought, the lieutenant sat around on the TV, I believe that was him, and that he thought he could save money. The jury can reject that as self-serving, spreading around his pretext, because he also said, as long as I'm chief, that Kelsey will never be promoted to lieutenant, to a different witness who provided the certification, Captain Kevin Orris. Chief Troy also stated, in the very month of the election, when he came into power with Mayor Healy, to Sergeant Whalen and to Sergeant DiStefano, that he would never promote Valerie Montoya, that Mayor Healy would never promote Valerie Montoya. So, yes, there's evidence that Troy said something that covered his tracks, but on the whole record, a jury's entitled to reject that, or conclude that there were mixed motives, but the political motive was a substantial or motivating factor, and defendants did not carry the burden on an affirmative defense. What are you looking for as relief? Looking for reversal of the dismissal of the, do you mean from this court? I'm looking, I'm asking about, what was the, assume you won, what was, what's the relief that you were asking for, your client, right? I believe, I don't have the complaint in front of me, I believe we asked for injunctive relief, I believe she'd want retroactive promotion to lieutenant, she's now retired, I cannot, I just don't understand this. So talk to me about that, talk to me about the injunctive relief piece, is that, is that something that's, that really could be done, is it practicable, even if you won? I mean, could the, is that doable for courts to get in and say, the Jersey City, I know she's been out of the force for X period of time, but you bring her back, and you bring her back in that position, and that's the way you staff your department. Well, she's retired now, but I believe that there is precedent for, under the civil service rules, to revive an expired promotional list, to effectuate a court order, in particular, for example, consistent with these facts, to remediate a determination of discriminatory non-promotion, and, you know, I don't know if there's an on-point holding in terms of reviving a list to effectuate an order to implement a judgment on politically unlawful motive, but I would find that, I would surmise it's analogous, and could be done in the past. In the practical world, it may be that once somebody's retired, it's on paper only, and I have anecdotal evidence that it's been done retroactively once someone on the force has retired, because it just changes the computation of pension benefits, and the status issues that are relevant to the emotional distress claim available under Section 1983. I, I don't know if I fully answered your questions, but I do want to talk about the other proofs on the prima facie case, because I feel that my appeal turns on it, and I want to make sure I have an opportunity to lay it out. Your Honor, jump to the cost defense. There's no evidence in support of it, but certainly upon, if this court reverses and sends the claims, claim back, they'll put their evidence on the stand and try to prove that affirmative defense. There is a lot of evidence that the restructuring was a sham, and I've set that forth in the briefs. I'm not going to recapitulate those facts. I'd rather go to the evidence of political motive on plaintiff's prima facie case, rather than rebutting that portion of their affirmative defense. There is no direct evidence requirement. The record below contains direct and circumstantial evidence to show prima facie motive. The heard us statements, whether this court would understand them as direct or circumstantial evidence, are capable of interpretation as politically motivated statements. I would submit they're only capable of interpretation as meaning heard us in the election, but there's enough on paper that a jury could make that call either way. I don't think this court has to conclude they can only be seen one way, the heard us statements. But there's certainly proof of politically retaliatory motive by Chief Troy in the month he got elected. On the unusually suggestive timing, that under Jensen is clearly circumstantial evidence of politically retaliatory motive, can be considered on the prima facie. I didn't discuss it at all, your honor. It simply wasn't discussed. I think it was overlooked. Well, I can't surmise. It's not in the opinion. But in the month of the election, Robert Troy tells one sergeant that he's not going to promote Montone. The mayor won't promote Montone. He tells two sergeants that because they're in front of her on the list, maybe they'll get promoted. He tells a third sergeant DeStefano, you're behind her, sorry, you're not getting promoted. In that same month, he makes false accusations about Montone's supposed conduct during the campaign. Knows those statements are false. Those smears about her supposed campaign conduct occurred in the month of the election. This is all very unusually suggestive timing, which constitutes circumstantial evidence of political motive. There are the five patronage promotions by this Healy-Troy administration. Not discussed, well, the trial court dismissed those as saying they might have some minimal probative value. And then didn't discuss those proofs at all. The proofs are very strong. And even on this appeal, the defendants haven't really explained why they think that doesn't move the ball down the field, let alone carry the day on the prima facie motive element. But Mayor Healy admitted in deposition, he spoke probably sure, spoke to Chief Robert Troy about four of those politically connected or politically rewarded people who were promoted. This court has said in Goodman, what's significant about a phone call of that kind is that the mere fact of the phone call is sufficient to infer those people's political connections got them promoted. As to the fifth patronage promotion by Healy and Troy of Lieutenant Edgar Martinez, promoted to lieutenant, Council President Mariano Vega testified, admitted in his deposition, he definitely talked to either Mayor Healy, his Chief of Staff, Police Chief Troy, the Police Director, or the Business Administrator, the top guys. He couldn't remember which one, but he did. So all five of those patronage promotions are certainly evidence under Goodman in which patronage promotions of other people or an attention to political activities to decide who to promote can be relevant on the prima facie motive. All of them are relevant. I would argue independently of any of the other evidence, it would be sufficient to have defeated summary judgment on political motive. We have Mayor Healy testifying in deposition that while he claims Jersey City doesn't indulge in political patronage, notwithstanding the five examples I just referred to, he acknowledged that rewarding our friends and punishing our enemies in the past has been a way Jersey City has almost done business. And we know under Goodman, an opinion of this court, that a history of patronage by the public employing entity can be evidence, circumstantial evidence, on political motive. Mayor Healy testified that Council Member Peter Brennan spoke to him, Mayor Healy, one or two times to try to get people promoted. Councilman Brennan was the go-to guy. I'm going to interrupt you. You're doing an excellent job. I want to make sure that you leave some daylight for Ms. Romalo so that she doesn't get up at one or two in the morning to make her argument. Well, let me move then to my, well, let me make a brief note about pretexting, since it was briefed so heavily. But I think the briefs stand on their own. The pretexting, I don't know where that came from. I have no clue where the judge got that from. I'll move on, Your Honor. I'll talk about the First Amendment claim briefly. The judge dismissed the First Amendment claim on several grounds, and I want to just tick them off and then I'll step aside so Ms. Romalo can have her full time. The first was the contention that, because most of the speech Valerie Montone engaged in that she claims was what subjected her to speech retaliation, because most of it was about her own experience of discrimination, harassment, or retaliation. Under Conniff v. Myers, that was all purely personal concern, and therefore it couldn't meet the public concern requirement. I would submit that that's just a plain misreading. I don't know where that came from either.  Well, I believe that Azaro would control, as this circuit's en banc precedent, a fortiori, because the plaintiff in Azaro complained internally about sexual harassment by an executive assistant to the commissioner, and did not allege systemic gender discrimination. And yet public concern was found notwithstanding the lack of alleging factually a systemic discrimination problem. In this case, Valerie Montone, of course, starting in her 1990s lawsuit, the first speech she alleges became protective conduct, was alleging all kinds of things relevant to other women in the force, in the operation of the force, including no locker rooms or bathrooms for women, lack of an effective anti-harassment policy, et cetera. And I briefed all of that public concern issue, which, by the way, was also raised to respond to. It was not briefed by defendants below or ever briefed by me until at this forum. The court also holds that because most of the speech conduct was about what Plaintiff Montone herself suffered, it really all should have been litigated under the Petition Clause, and because Plaintiff's complaint doesn't say the words Petition Clause, it's not in the lawsuit. It's true, the complaint doesn't say Petition Clause. It doesn't say Free Speech Clause either. It says First Amendment and refers to speech and expression. But notwithstanding that, the question in this circuit under Fowler is whether the factual allegations were sufficient to make the claim. And is it sufficient to make a claim to say for the first time in your summary judgment briefing, I know we've been talking about this in terms of free speech and we've been talking about it in terms of political retaliation, but I really mean Petition 2. I mean, if we believe the district court judge, this didn't surface until awfully late in the game. And he viewed it as an attempt to sort of, at the last minute, amend your complaint. What's wrong with his view of that? Okay, there are several things wrong with his view of that. Well, just give me your best one, okay? I have two best ones, if you'll indulge me. One is law and one is fact. In Borough v. Duryea, the U.S. Supreme Court held that because speech and petitions could equally be pursued by a public employee under the Free Speech Clause as under the Petition Clause, the matter of public concern element from the Speech Clause would be imported into the Petition Clause, I would submit as a matter of law that holding means Valerie Montone was within her rights to pursue speech found in documents or behavior denominated a petition under the Free Speech Clause, and so we didn't need to say the words that's how people are viewed. That might very well be true, but that wouldn't mean that you'd made a Petition Clause claim. It would mean you'd made a Free Speech Clause claim that could rely on things said in a petition, right? As protected conduct, exactly. The tests are the same. So you don't really care whether you call it petition or speech, do you? Only if Judge Chesler and this court care. But then if you do care, my second best argument. He did care, but it was again raised to a sponte. Defendants didn't claim that we were trying to amend the complaint and state a Petition Clause claim in their briefs below. So I never had an opportunity to address it before Judge Chesler. He did care, but it was raised to a sponte, and perhaps he would have cared less if we had had more legal presentations on the topic. My second best factual argument is that the face of the complaint actually says in paragraph 54, 58, 69, 71, 75, it describes all of the so-called petition conduct if we're going to view it that way. The first lawsuit. The notice of tort claims and complaints about Director James Carter in 2002, et cetera, et cetera. In those five paragraphs, specifically the complaint pleads, each of those activities, quote, contributed to defendants retaliatory animus against her. We're not talking about a sandbag argument that came up on summary judgment. And by the way, it didn't come up on summary judgment. It's come up in this appeal. Perhaps by a certain viewpoint, plaintiff was the one sandbag we could have moved to amend at a time when there was no prejudice and when we would have won on that lenient standard. But the face of the complaint on the day this lawsuit was filed said each one of those functionally described petition activities contributed to retaliatory animus against plaintiff. And all of those paragraphs were incorporated  So I think it's a tempest and a teapot on that formal issue. Okay. Thank you very much. Thanks. Excuse me. May it please the court. Good afternoon. My name is Kathleen Romalo from the law firm of Brenegar and Feldman. And I'm appearing on behalf of plaintiff's appellants, John Astriab, Clyde Banks, James Buckley, William Kuhnane, Richard Guistafano. We're with you. It's quite a long list. We're with you. I, of course, would like to address the aspect of our briefing that is different than and stands separately from the Montone briefings. And that, of course, is the issue of standing. I have the good fortune of arguing the one point of the lower court's decision that the appellants don't disagree with. The lower court did say that they had found defendants' arguments with respect to standing unpersuasive. And we similarly agree that under the standards set in the Angelino case and in the Thompson case, we certainly meet standing in this matter. What's the right approach here for, I mean, how do we decide that these gentlemen are, first, that they've been injured in fact based on what happened to Ms. Montone? Some of them were, as Chief Troy was quick to say, some of them were above her on the list, some of them were below her on the list. Does that make any difference? How do we sort our way through the different positions that they had as they were working their way through the list that never got promotions made from it? Well, it's our position that they were injured due to the fact that they were on a list with Montone. Troy decided he did not want to promote her. He decided, or essentially dug his heels in and ceased making all promotions from the list. And then retroactively, in our view, came up with a justification for that by saying, oh, I'm doing a reorganization, a reorganization that we felt was obviously pretextual. Now- Hold on just a second. And I, here's what I'm trying to understand. And it certainly need no disrespect to any of your clients. I'm sure all fine officers. How would we, your opponents say, in effect, look, who's to say those people who were below her on the list would ever have been promoted? We don't know, you know, whether there would have been three, four, five, even if you assume that they were gunning for Valerie Montone. You don't know that these other folks, that promotions ever would have reached there. So you can't assume that they're, in fact, injured. What's the response that pulls those clients of yours into the zone of to be protected by derivative standing? Well, when you go through the recommendations or the memos that were being sent throughout this time period by Mark Russ, it quickly had reached the level of recommending 12 lieutenants. I think at the time that these events happened, the last of my clients was about 12th, I believe 12th on the list. Ultimately, in December of 06, they promoted 12 lieutenants, and then shortly thereafter promoted an additional seven, making it 19 from the new list. I think that's a question of fact, but I think they have a strong argument that had the illegal motive not been present, they all very likely would have gotten promoted. There happened to have been a fair amount of attrition during this period. The numbers of lieutenants dwindled from I think somewhere in the mid-60s to about 30 over this time period. So I think reasonably, and given their awareness of the attrition, these men are aware of how long various people have been on the job, what the likelihood is that they're going to be retiring, et cetera. So they had a reasonable reason to believe that they were gonna get promoted until this Montone sequence of events transpired. I know that the defendants have tried to make much of the quote-unquote rule of three provisions in the civil service law. Essentially, they're saying, well, if we were really going to discriminate against Montone, we could have just used the rule of three, or how do you know for sure who would have gotten promoted, who would have not gotten promoted? In this litigation, to my knowledge, there was never any allegation that any of my clients were not considered to be competent police officers. So there's no reason to think that there would have been any specific reason not to promote them on that basis. With regard to Ms. Montone and the rule of three, I think that is what really strengthens our argument that we have standing here. This was not an unintentional act. They were not accidental victims. This was a scheme designed to mask discrimination. Also-  cause of action context for derivative, essentially a derivative cause of action here under the First Amendment? Could you repeat that? I'm sorry. You know, Angelino was decided under the employment discrimination statute, and that context seemed to me to be important in the decision in Angelino to allow for the derivative cause of action to say that somebody else was discriminated against and it's hurt me and I can sue for damages. Is there any authority that says in the First Amendment context that none of these defendants, none of these plaintiffs, I'm sorry, none of these officers engaged in First Amendment protected conduct? You're not, you can't satisfy that element. You're relying on Montone's First Amendment protected conduct, and I'm looking for authority that says under those circumstances, they can sue. Okay, well let me address that issue. That's a good issue. Under Angelini and then as further refined by Thompson, a test of a zone of interest was brought forth, and it was the zone of interest sought to be protected by the statutory provision whose violation forms the legal basis for the complaint. In this particular. That's how they asked you. Because the zone would be the constitutional guarantees. Well. That's the interest. I'm sorry, let me explain then our point of view on this. I think that the policy and the desire to protect First Amendment rights is highly compelling in this country and in this jurisdiction. And the desire to broadly protect those rights is reflected in the fact that you are protected for supporting a candidate. You're protected from supporting a candidate in the same party, but who's not in favor. You're even protected for not exercising your political rights. Here, by targeting an entire group of people for the political activities of one person, you're creating a very treacherous environment in the police department. An environment where one of the witnesses had to actually make a call over who to support and who not to support as a gamble as to most maximize his likelihood of getting promoted. I don't think that that is the intent. I mean, to protect the rights and the abilities of the members of the police department to either support a candidate, take no position politically, should be free from the fear that, well, if I support the wrong candidate, not only myself, but my peer group, my colleagues on a promotional list may be targeted. So your basic argument is that the public policy and support of protecting free association and free speech rights under the First Amendment is at least as compelling as Title VII policy, right? At least as compelling, if not more compelling. The chilling effect that not allowing my clients to have a cause of action where essentially they elected not to support a political candidate. That was their free speech right to do. If they are not to be punished for that because of what someone else chose to do in exercising her political rights, that is unfair retaliation that corrosive of First Amendment rights. Corrosive and goes against them, yes. What do you say about the injunctive relief question that I was asking Ms. Manshall about? I understand that your clients also have asked for injunctive relief, right? Yes, and just to clarify, some of my clients have retired, some are still on the job. What they would like, the retired members would certainly like to be, would like their back pay. They would like to be made lieutenant even though they might not necessarily return to work. They would have the credits towards their pensions. It would be deemed as though they had been lieutenants when they left the job. The calculation of their credits. That would work for the retired ones. What about the ones that are still on the force? Can you say to the Jersey City Police Department, you may have all the slots for a lieutenant filled right now but you have to make these people lieutenants and you have to give them lieutenant grade assignments. Is that a practicable thing for a court to do? Well, we believe that it is practicable and it can be done. They're all well-trained and well-qualified and space should certainly be made for them so that they are not caused to suffer the negative effects of what happened a few years ago on an ongoing basis for the rest of their career. Some of them declined to take the exam to be on the following list. Am I right about that? They opted not to. Right. Is that of any legal consequence? If somebody's told, look, we're not promoting from that list, you're still here, you gotta test for it again to be eligible for the new list. Does that have a, should that have any legal consequence? You know, I do not believe that it should. I mean, and certainly not in the context of a summary judgment motion. At best, that would be a mitigation argument. But in our view, no, they chose not to take the, it's not necessarily an easy process from a personal level to give the time up to take the test again. They felt very disappointed and basically unenthusiastic about their ability to proceed in the atmosphere of the Jersey City Police Department given what they had been subjected to. I don't necessarily see why they should be forced to go through a testing process to address a wrong that should not have happened in the first place. Thank you. Thank you. Thank you. May it please the court. My name is Richard Gantner. I'm here on behalf of the city of Jersey City, the police department, and Mayor Healy. Of course, we ask this court to affirm the trial court's judgments in both Montone and Astreab for the reasons set forth in our briefs as well as the reasons set forth by Judge Chesler in his opinions. Today, I will address four points in support of our position, and we will rely on our briefs for the other arguments. It seems evident that rumors, hearsay, conjecture, and surmise can generate a lot of paper. But when you peel back the layers in this case, what you're left with is the Astreab indirect third-party cause of action that can't stand on its own and must necessarily fail if the Montone case fails. And additionally- I gotta ask you a question. I'm sorry. Yeah, go ahead, go ahead. Yes, sir. I just, I wanna read you something from the district court's opinion, and I want you to respond to it. Because I'm having trouble following the logic of it, and I'm hoping you can help. Yes, sir. I'm looking at page five. That's 821 in the appendix. And... There's the statement in text, and then it's picked up further in note one. One of the plaintiff's main points is that the evidence shows that promotions to the lieutenant were needed during Troy's tenure as chief. This court finds that this evidence is not relevant to proving the motivating factor element. Now, and then it goes on and says in the note, even if plaintiff persuaded at trier fact that the reorganization department was a sham, ellipse, this still says nothing about whether plaintiff protected, plaintiff's protected conduct was a substantial or motivating factor in the government's decision not to promote her. So, it sounds like what the district court is saying is, so let's suppose that a jury accepted all their evidence and it was a sham, the reorganization. Of course, that means it's a sham to cover up that they didn't want to promote Ms. Montone and the others who were on the list that that reorganization was, as the district court posits here, a sham. And then says, that still says nothing about whether it was a motivating factor in the government's decision not to promote her. And candidly, I got lost in that thicket because it sounds to me like if you're saying a jury could accept it's a sham, you're saying a jury could accept that this was a coverup for unlawful retaliation. And if a jury did accept that, how can it not be the case that the evidence is relevant to being, to whether there was a motivating factor in setting up the sham? I believe what the court is referring to, Judge Jordan, is the fact that the plaintiffs assert that there has been so-called bad blood between Montone and Chief Troy dating back maybe to as far back as when the two of them were 11 years old. And you have Ms. Montone herself testifying in depositions that the reason that she was having problems with Troy, and the reason that Troy didn't like her was because she wouldn't give him money out of her 1993 lawsuit. And I think that what the court is referring to there. That was one of six reasons. Excuse me, sir? That was one of six reasons. There were five others. Two of them dealing with sexual harassment. That was only one. And that one may be the only thing the district court got right. Yeah, but keep, because you've given me some background stuff that I'm waiting for you to explain to me how the logic can track here. If you accept that a jury could listen to this evidence and say it's a sham, how could the evidence not be relevant to motivation? Because if the basis of the so-called sham was not an unlawful basis, in other words, if it was because of disputes with Montone having nothing to do with her political affiliation, then it's not forbidden by law. Okay, but there was, as Chief Judge McKee said, there were multiple other points of evidence that were put forth that this was, you know, that he was mad at her because she distributed copies of the New York Times with the mayor in an unflattering photograph. That he was upset because it was well known that she was supporting the opposing candidate. That there was, I mean, there's a series of things that the district court judge names and which are discussed in the briefing. Is it enough for you to say, well, there's one basis on which maybe it wouldn't have been a problem, but there's other evidence on which it would have been a problem, right? The problem with all that evidence, Judge, is that none of it can withstand scrutiny after you carve away all of the problems with hearsay, with the fact that it's all based on rumors, with the fact that the certifications. How's it hearsay if you have people prepared and who did say under oath, Chief Troy came to me and he said, hey, it's not happening while she's around. Forget about it. So long as that lady's breathing, nobody's getting promoted. I'm paraphrasing liberally, but how is that hearsay? It's an admission by a party opponent. It's an admission, if anything, that he did not want to promote Montone if you believe that the statement was even made, but it's not an admission that he didn't want to promote Montone because of her political affiliation. As a matter of fact- Well, that's something you get to argue to a jury, but it's not something that keeps the evidence out. I mean, you just one second ago seemed to say none of that would come in because it's hearsay, but it would come in because it's not hearsay. It's an admission. But it's not an admission of any wrongdoing. So even if it came in, it is not material. It couldn't have any impact on the case. No jury listening, no jury hearing, Ritchie Stefano, excuse me, I don't mean to be unduly familiar, Officer Stefano, come in and say, you know what, he said right to me, as long as that woman's there, nobody's getting promoted. That nobody could hear that and think wait a second, I put that together with these points of evidence about animus toward her and I conclude, or I could conclude, political retaliation. Because you have to take this out of the zone of a rational jury, right? But there's no basis or reasons given in the DiStefano certification or in his testimony. When you get to the other two people that Troy supposedly made these comments to, the reasons are given. So what you're saying, Judge, is that you're asking a jury to say, we can agree that it was discrimination even though the plaintiffs themselves are offering evidence that it was not. They say. No, what I'm asking is, isn't it for a jury to decide whether you didn't try to hurt us means you didn't work against us politically or you were laying for the mayor's son? Absolutely not, Your Honor, because it is not a genuine issue if a reasonable jury couldn't believe it. And a reasonable jury couldn't believe it because the plaintiffs themselves give the reason for that position that Troy was taking. The plaintiffs themselves say, the mayor's wife was under the impression that she had threatened their son. And that was from Scurbo. Whalen said, when he bemoaned the fact that maybe Chief Troy was being unfair and not making promotions, Troy responded, well, how would you feel if your best friend's wife is sitting at the kitchen table crying over threats made against her by her son and nephew? So your position, and your case rises and falls on winning an upholding of your summary judgment, on our accepting that in speaking in a completely different conversation, apart from the one about the mayor's son, somebody said, Chief Troy says, you didn't try to hurt us, that a jury could only understand that that reflected a statement about supposed bad feelings toward the mayor's son. That's the only conclusion they could get to. Your Honor, it wasn't in a complete, it was in the same conversation. I thought there were two different conversations. No, let me explain. There was more than one statement where that was made. Right, you have three different sergeants. You have DiStefano, and I can do this very quickly. With DiStefano, he said, you're okay with us, but the mayor doesn't want to promote her, the mayor will not promote her. Never gives a reason for it. He didn't say to DiStefano, or at least DiStefano didn't say in his certification, you didn't try to hurt us. I think he did testify to that in his deposition. But Scurbo says, well, are you in front of her or in back of Valerie? And then Scurbo testifies in his deposition, I was under the impression, he said, from speaking with Chief Troy, that the mayor's wife was under the impression that she had threatened their son. Then there's a third conversation with Whalen, and these are all right around after the election. And by the way, these witnesses all approached Troy, not the other way around, and I think that's significant. But in the third one with Whalen. Why is that legally significant? Well, because one of the arguments, and I should get back to this point, but one of the arguments that they make is that timing is somehow an issue. But the timing was chosen by the plaintiffs, not by Chief Troy, and he was being harangued by them soon after the election. Are we going to make promotions or are we going to? Again, that's an argument, and you make the jury. I'm sitting here, I can't believe that we have this summary judgment standard that we have. The judge's summary judgment is supposed to take all this stuff, interpret it in the way most favorable to the plaintiff, not fish through it and dig through it and get out a magnifying glass and try to find a way that the plaintiff couldn't possibly prevail given this evidence, and that's what the district court did here. Went through all this stuff and dismissed it. A disputed issue has to be genuine, and it can't be genuine if a... Was the statement made, you didn't hurt us, you're okay, was there any issue about that? You didn't hurt, he explains what you didn't hurt us means. He said, this was to Whelan. Whelan specifically asked him, and he said, how would you feel if your best friend's wife is sitting at the kitchen table crying over threats made against her by her son and nephew? He answered it. He said what the motivation was. You just said there were three instances. I thought you said three instances where... There were three, yes. There was DiStefano, Skirbo, and Whelan. Those are the three statements. In the first one, there's no explanation given, and in the second two, Skirbo and Whelan, Chief Troy, at least according to these witnesses, gives the motivation. He states what the motivation is, and that motivation is purely personal. It has nothing to do with politics. And you're saying that Chief Troy is so charismatic, so cloaked with the shining light of truth, there's no way in the world if he gets on the witness stand that 12 randomly selected persons above the age of 18 in Jersey City could possibly look at him and say, hey, Chief Troy, you're a liar. That couldn't happen. They've got to believe what he says. That's what you're arguing. So there's no issue of material facts. Whatever choice he has. What that means then is that nobody could ever get summary judgment because any plaintiff could say anything that they want. And then you'd always have a disputed fact. You've got much more than this. You've got a judge talking about evidence of pretext is not relevant because it's not under McDonnell Douglas. I don't know where that came from. There's so many, it seems to me, situations where the judge looked at the evidence through the defendant's eyes, not through the plaintiff's eyes and then made mistakes of law. I'm not sure I've ever seen an employment discrimination case quite like this. May I respond to that last point, Chief Judge McKee? What Judge Chesler was saying with that remark, he was simply making the point that a disputed fact has to be not only genuine but also material. And what he was saying was even though these facts are disputed and a reasonable juror might conclude that Chief Troy bore ill will against Montone, that information has no capacity to affect the outcome. It's not material. It has no capacity to affect the outcome of the litigation because according to the plaintiffs themselves, the motivation for Chief Troy taking that position was you made my best friend's wife cry. Well, you keep going back to that as if it were the only evidence in the case. There's lots of evidence in the case that the plaintiffs have put in the record that would perhaps deal with things wholly apart from that. Are you denying the existence of other stuff in the record that's likely one thing? Well, the other piece of evidence is that there were rumors rampant throughout the police department that Montone was supposedly the stopper on the list, right? And it's remarkable. Rumors, the statement was made. You're behind Montone, forget it. I'm sorry? Wasn't the statement made, where are you on the list? You're behind Montone, forget it? According to the Astriot plaintiffs, that statement was made. And they're relying on this rumor. According to the Astriot plaintiffs, you can't just dismiss it, because the plaintiff's bringing it in. I know, but. You're saying you can only consider it of the defense. Your Honor, I think the point I'm trying to make here is that I explained the remark, and then you said, well, there's other evidence. And now I have to. You just have that bad view. The court said it, and now I have to address that other evidence. When you look at the other evidence, a lot of it depends on Montone's own self-serving allegations of fact that are blatantly contradicted by the record. A lot of it is. But if she's testifying. If she's testifying, look, you may well be right that she's not worthy of belief, and that all of this is self-serving statements by her. But if she says, look, this is what I did, and this is what they said to me,  And typically, we put evidence in front of juries if there's a competing set of evidence. So if she's, the fact that she's saying it and it's self-serving doesn't mean it's not admissible, does it? I believe that the Supreme Court in Scott versus Harris said that statements of an interested party that are blatantly contradicted by the record are not sufficient to defeat summary judgment. And that is precisely why. That was contradicted by a videotape of the police chase in that case. That's what they said in that context. But I think that the statement can be applied more broadly. And let me just point this out. To understand the quality of Montone's evidence, you have a whole slew of statements that she made. I spoke to this person, I spoke to that person. And one by one, they're all deposed. And one by one, they all deny that they remember having any conversations with her or that she actually said those things. And then when you get into the whole business with all these rumors flying around the department, when you get to the bottom of who said what to who, every name is a plaintiff in the case. Astriab told Whale and who told Banks. It's a- Your theory can't be that because they're plaintiffs, they don't give competent evidence, can it? That's what you're arguing. My theory is- It was a law 150 years ago, but it ain't the law now. If they're going to rely on evidence that they themselves have created and maintained, then it's completely improper. And that is exactly what the record shows happened here. I'm struggling with, well, I think I got your position. But when you say completely improper, I guess I'd like you to point us at some law. Because at the end of the day, it sounds like what you're saying is the jury shouldn't believe these people. But that doesn't really speak to the question of whether the jury should get the chance to hear these people. Does it? I think that they should not get the chance because there's no reasonable fact finder, and I see my time is up, but there's no reasonable fact finder who could believe them on the basis of this evidence. And therefore, even though it's a fact in dispute, it is not genuine. Okay. Thank you. Thanks. Thank you. May it please the court, your honors. My name is Dominic Carminola. I represent the defendant at Pelley, Robert Troy. Your honors, as with Mr. Gantner, I will rely on the briefing and I'll rely on the arguments that have been expressed by Mr. Gantner. And I'll try my best. I've been taking notes and I would like to try to track back to some of these questions that have been raised and try to address some of these issues that seem to have raised either a question or a concern in your minds. When you do that, at some point, and I wanted to ask Mr. Gantner this, but got so excited about the summary judgment standard, I failed to do it. He gets excited about things like that. Yeah. It's rule 56. Talk to us about the practicality of the relief. I recognize that you all believe the relief question should never be a right now. It's a fantastic question. Talk to us about that. One of the issues that it draws out is this whole underlying assumption that there was a right to promotions, that there was some mandate that promotions be made. That current underlies both plaintiff's cases and it exists nowhere. The practical reality is that for the people who are retired, they probably will just get a retroactive promotion. Their retirement will be adjusted and possibly elevated in some manner and they'll get adjustment for back pay. For the people who are currently still employed, I don't know that there's that many, maybe two or three, but for the people that are currently still employed, that will raise some practical issues. Why couldn't they get paid differential? They may be able to get paid differential, but you're talking now about people that may not be sufficiently trained. They may not be qualified. They refuse to take the test going forward. You know, many times, we talk about this 2003 to 2006 list that you referenced before. Many times, and Judge, I think you misspoke. I don't think you did it intentionally. You said, I thought I heard you say there were no promotions off of the list. There actually were 18 promotions off of that 2003 to 2006 list. Hey, I apologize. I think what I was trying to say, what I understood the record to be was that there were no promotions at all during Chief Troy's tenure to Lieutenant. That was what I was attempting to express. Yes, and I thought that might be it. I was gonna come back to that. You are correct. Thank you. But off of that actual list, that list was a three-year list, common term for the lists, and off of that list, there were many promotions. How many after she retired? I'm sorry? How many after she retired, Montone? I don't know that answer, Judge. Could be wrong, because if all the promotions happened after she was gone, so they could then make lieutenants without voting her. Well, again, it goes to this underlying premise that I brought up a second ago, that the plaintiffs continue to pursue this as if there was a right to promotion. For example, when they were asked at depositions about when the promotions should have taken place, there was no answer for that. Chief Troy becomes the acting chief, and then the chief. It seems to me to be the right of hearing. There's no certain constitutional right to a promotion or to a job as a police officer, for that matter. But if it's a scenario where, but for Montone's political activity of advancing the political cause of Lemire's opponent, there would have been promotions to a lieutenant, then it seems to me that there's an issue that the only reason that the promotions weren't made, even though they weren't entitled to promotions in the abstract, the only reason that they weren't promoted was because Montone, quote, the stopper, close quote, was there, and that politically they wanted to nail her, and they could nail her if they made her a lieutenant. Again, I think that makes the leap that the plaintiffs are making, which is that promotions would be required. There was no legal obligation to make promotions. I think everyone agrees on that. Their argument is that promotions at some point would have been needed. And the sham. Isn't it beyond that? It's not just that they would have been needed. It's that they would have been made. That's the assertion they're making. There was a history of making promotions. There was this brief period of your client's tenure where there were no promotions to lieutenant, and then after he leaves, things resume at a more normal pace but that interregnum, the period of your client's tenure as chief marks a period when things didn't happen as they ordinarily did, and then the plaintiffs say, and here's why. What's as a matter of logical proof for their damages, not that I'm entitled to it, but I would have had it, but for this animus on a political basis. How's that stray off? Again, not necessarily, because we're talking about a list that 18 promotions were made off of. And many times what you do is you take all the circumstances into account. You take into account the economic climate. Does the business administrator have the money? Because you have to go to the business administrator and say, do you have the money to make these promotions? Do we need the manpower? Where are we going to allocate it? Do I want to allocate it in different places? Do I want people on the street? Do I want people in supervisory positions? You look at all those things, but then you also look at the fact that the list may be coming to an end, and now you're promoting from the bottom of a list when what you might want to do is wait, have a new test, and promote from the top of a new list, which would presumably equate to perhaps more qualified people. Yeah, but Mr. Conroy, did I just say your name right? That was terrific. Thank you. Thanks. Isn't that a matter of proof on your affirmative defense? I mean, Ms. Minchell was saying correctly, I think, but that's why I'm asking you, that you have a chance to come back and say, we would have done this anyway. At the end of the day, these people would not have been promoted anyway because there wasn't money in the budget, because the business manager would have said no, because we were at the bottom of the list, but that that's a point that you only get to as a matter of proof after you're there at trial, not something that cuts you off before trial and summary judgment. Terrific questions. I'm gonna give you a yes, but. Yes, but we don't get there. We don't get there because of the substantial and motivating factor element that Judge Chesler looked at and said we didn't get there. You brought up this question before about the sham, the footnote where he talks about the sham. Footnote one. And what he was pointing to was that even if you look at that and construe it as a sham, it doesn't answer the question that you need to answer about what was the substantial and motivating factor. And he looked at all this evidence and we recognize that this court will do the same. He drilled down all through this evidence and he recognized that despite the shotgun approach that's being taken here, despite everything that's being thrown against the wall, these plaintiffs couldn't get over the hurdle of that substantial and motivating factor based on the very proofs that they submit. Judge, yes, we do dispute many of these facts, but we are recognizing for purposes of this motion and the appeal that we have to accept what they say to be true. And we've done that in arguing the case. And what we have said is no one has come forward to say Chief Troy said these things, many of which were, by the way, denied by him. But no one has come forward to say Chief Troy said these things and connected them to some political animus. In fact, when you look at. Right, what is, you didn't try to hurt us or you're okay because you didn't try to hurt us. Those are things that in the context of the conversation, the very conversation about promotion could be understood. Could they not? You didn't try to hurt us politically. Is that not, is that just, I mean, I understand your co-counsel, Mr. Gantner, said that's beyond the pale. No one could understand those words that way. But I'll put it to you. I don't think he meant that. I don't think he meant that. I think what he meant to say is based on the record evidence and there's substantial amount of it, and we recognize it, no one could interpret it that way because no one has said that there was a political context associated with it. What they've all said, which is throughout the record, is that Chief Troy and Valerie Montone, who used to be very close friends, who then had a falling out, had problems from the late 90s throughout. That's what they've all said. They've never connected it to this political animus that the plaintiffs are trying to now fabricate through kind of mucking up the waters. Everyone has said, we know these two didn't like each other. And you know what? Now we're being dragged into it. Just because he doesn't like her doesn't mean I shouldn't be promoted. No one has said it's because of Manzo. In fact, just comb the record and look for what evidence she submitted that she was this huge supporter of Lou Manzo and that it was a problem and that people had issues with it. It's not there. Everything is connected to the personal animus. Every statement and every piece of evidence. And that's why Judge Chesler, who combed this record completely, focused on that and said, even if I think this was a sham promotion, which I don't think he did because there was a lot of evidence to support going forward with it and that it was a good thing, whether it ultimately worked or not, he said, even if I think that, I don't see it helping with getting to this substantial and motivating factor. Your Honors, thank you. I appreciate the additional time. Thank you, very good argument. Thank you. Two points, just very briefly. I just want to clarify two things. I think, Judge Jordan, you're right about the heard-us statements. The first one was told by Chief Troy to Sergeant DiStefano, and there was never any discussion in that conversation about the alleged threat Valerie Montone made against Healy's son or nephew. It was a totally standalone conversation. And in fact, Sergeant DiStefano testified that what he understood Chief Troy to mean was, I didn't come out against him in the election. In addition, Mr. Gantner argued that when Sergeant Whalen heard Chief Troy say, you know, you didn't heard us, Whalen asked specifically, according to Mr. Gantner, what did you mean? And that's when Chief Troy segued into, well, how would you like it if your friend's wife was crying? And I would just ask your honors if you find that troubling to read the testimony, because that's not how the conversation went. Those were two distinct thoughts, even in Sergeant Whalen's testimony of his conversation with Chief Troy. And it's a good point to consider, Sergeant Whalen was called to speak to Chief Troy because Chief Troy wanted to tell him, I'm putting you in charge of the Megan's Law Unit, which Sergeant Whalen testified he considered desirable. And the first thing out of his mouth was, Sergeant Whalen's mouth was, why I didn't do anything? Now, that certainly didn't mean I didn't do anything to threaten the mayor's son or nephew or make his wife cry. Why? I didn't do anything. And Chief Troy said, yeah, but you didn't heard us. That is clearly capable of political meaning. And circling back one last time to the question you posed to me and everyone else about what's the remedy here on the promotion, there is a case, I'm sorry, I don't know it offhand, Mr. Carminello may know it, it might be Grenziel, but there is a New Jersey case about whether New Jersey uses bumping or first available position. But there is case law. And if your honors wanted letters on that point. 28J would be helpful, just to say to the committee. That's all, thank you. Thank you. To take all counsel and take the matter under advice.